**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| JAIME DELGADO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 06-CV-0004-CVE-PJC |
| | ) |
| TOM KELLY & ASSOCIATES, INC., | ) |
| an Oklahoma corporation, | ) |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

Now before the Court is the Motion for Summary Judgment (Dkt. # 18) filed by defendant Tom Kelly & Associates, Inc. ("Kelly & Associates") and Defendant's Motion in Limine (Dkt. # 22). Plaintiff Jaime Delgado ("Delgado") filed a petition in the District Court of Tulsa County on December 15, 2005 alleging that he was wrongfully discharged by defendant in violation of OKLA. STAT. tit. 85, § 5 and that defendant discriminated against him based on his disability in violation of the Americans With Disabilities Act, 42 U.S.C. § 12101, et. seq. ("ADA"). Defendant removed to this Court on the basis of federal question jurisdiction on January 4, 2006. For the reasons set forth below, the Court grants defendant's motion for summary judgment. It follows that the motion in limine is moot.

**I.**

Kelly & Associates is a dental laboratory that has been in business for over forty (40) years. Tom Kelly ("Mr. Kelly") is the primary owner of Kelly & Associates and was plaintiff's direct supervisor. Mr. Kelly's wife, Mary Kelly ("Mrs. Kelly"), is the secretary and treasurer of Kelly & Associates. Plaintiff was an employee at Kelly & Associates at two different times – from 1995 to 1997 and from 1999 to 2005. Plaintiff's primary job responsibility at Kelly & Associates was to

polish and refine porcelain teeth. This duty involved the use of a belt-driven or electronically-driven grinding stone hand piece, which is approximately eight inches in length and weighs between ten and fifteen ounces. Dkt. # 19, Ex. 1, Delgado Deposition, at 8. Plaintiff grinds porcelain with his right hand and builds porcelain with his left hand. The heaviest piece of equipment that plaintiff used to perform these duties weighs less than five pounds. Id. at 11.

Beginning in approximately July 2004, Kelly & Associates adopted a cellular phone policy to limit the time employees talked on their cellular phones during work hours. According to the policy, employees could talk on their cellular phones between 9:30 a.m. and 9:45 a.m., between 2:30 p.m. and 2:45 p.m., and during their hour-long lunch break. Plaintiff's cellular phone records show that plaintiff talked on his phone outside of these designated times. Dkt. # 19, Ex. 2. Mr. Kelly allegedly reprimanded plaintiff for talking on his cellular phone during work hours, but never made a written record of those reprimands.

In June or July 2003, plaintiff first experienced some pain in his wrist. He noticed tingling and numbness in his hands, particularly in his right hand, when he was working. Dkt. # 19, Ex. 1, at 25. He notified Mr. Kelly of these problems, and Mr. Kelly told him to "take care of it." Dkt. # 21, Ex. 11, Delgado Deposition, at 31. Plaintiff claims that he informed Mr. Kelly that the problem stemmed from his work. Dkt. # 21, Ex. 4, Delgado Deposition, at 10. But Mr. Kelly contends that plaintiff never mentioned that the problem was work-related. Dkt. # 19, at 3. Mr. Kelly attributed plaintiff's condition to his participation in ATV-riding, fly-fishing, and hunting. Dkt. # 21, Ex. 9, Mr. Kelly Deposition, at 7. However, plaintiff testified that he has never noticed the tingling or numbness in his hands while participating in any of these recreational activities. Dkt. # 21, Ex. 11,

at 31-32. It is undisputed that plaintiff did not file an accident report relating to this injury. Dkt. # 21, Ex. 4, at 10.

Plaintiff saw several doctors for his wrist and hand condition. Dkt. # 21, Ex. 11, at 31-37. He always used his lunch break for doctors' appointments. Some of the doctors told him that the condition was carpal tunnel syndrome and that he would need surgery to correct the problem. Id. at 34. In October 2004, plaintiff saw Garrett Watts, M.D., for treatment. Dr. Watts filed out a report that stated: "Jaime believes that his work activities aggravate and/or caused his problems; however, he does not attribute that in particular to his current employer." Dkt. # 19, Ex. 3. In explaining this notation, plaintiff testified that he informed Dr. Watts that he had been grinding teeth for his entire professional career, but had never experienced problems in his previous jobs or during the first several years of his employment at Kelly & Associates. Dkt. # 21, Ex. 11, Delgado Deposition, at 33. Plaintiff told Dr. Watts that he did not attribute the carpal tunnel syndrome to Kelly & Associates in particular; rather he believed it to be the result of many years of grinding porcelain. Id.

After several appointments with different doctors, plaintiff chose to undergo surgery under Dr. Watts. He chose Dr. Watts to perform the surgery because he felt more comfortable with him and because Dr. Watts told plaintiff that the recovery would be only six weeks, as compared to an estimation of six months by another doctor. Id. at 34.

Prior to the surgery, plaintiff claims that he told Mr. Kelly, "Well, Tom, I'll tell you what. I'll just file a Workers' Comp on my carpal tunnel and sit home for a while till I get healed." Dkt. # 21, Ex. 11, at 30. Plaintiff claims that Mr. Kelly "turned away and walked away. That was the

end of the conversation" and that Mr. Kelly "didn't want to hear me say that." Id. However, Mr. Kelly denies that such a conversation took place.

In October 2004, plaintiff discussed with Mr. Kelly the possibility of having surgery. Dkt. # 19, Ex. 1, at 30. They determined that December would be the best time to undergo surgery since the laboratory was scheduled to be closed from December 26 - 31, 2004. Id. Plaintiff scheduled and underwent surgery on December 17, 2004 on his right hand. He took a week vacation immediately after surgery for recovery purposes. Id.

Plaintiff attended the office Christmas luncheon, which took place the week before Christmas. Dkt. # 21, Ex. 11, at 38. At the luncheon, plaintiff had a discussion regarding his work situation with Mrs. Kelly. Plaintiff and Mrs. Kelly's versions of that conversation differ. Plaintiff contends that Mrs. Kelly asked him to come back to work to build porcelain with his left, un-operated hand. Id. He claims that he responded that, despite his recent surgery, he would try to come back to work. By contrast, Mrs. Kelly contends that she did not ask plaintiff to return to work; rather, plaintiff requested to commence work. Dkt. # 21, Ex. 10, Mrs. Kelly Deposition, at 20.

On the following Monday, December 26, 2004, Mrs. Kelly called plaintiff and inquired whether he was still planning to come to work. Dkt. # 21, Ex. 11, at 38. While the office was originally supposed to be closed from December 26 - 31, 2004, Mr. Kelly nonetheless decided to open the office that week. Dkt. # 21, Ex. 11, at 13. Plaintiff came into the office that day and for the rest of the week. He built porcelain with his left hand; however, he was unable to use the grinding device at that time due to his recent surgery. Thus, his production that week was substantially less than his normal, pre-operation production.

Dr. Watts removed plaintiff's splint and released plaintiff to "light duty" work on December 30, 2004. Dkt. # 21, Ex. 11, at 12. The release, while it clearly indicates that plaintiff was restricted to "light duty," is otherwise difficult to read. The hand-writing is somewhat illegible ("Avoid heavy _____ or _____ with R hand"), and there is a dispute as to whether the release specifically restricts plaintiff from grinding. Dkt. # 19, Ex. 6.

Mr. Kelly called plaintiff on January 4, 2005, at which time Mr. Kelly was away from the office. He told plaintiff that the lab was very slow and that production was down. Mr. Kelly told plaintiff that "he was having a hard time justifying [plaintiff's] salary." Dkt. # 21, Ex. 11, at 9. According to plaintiff, he responded to Mr. Kelly: "Tom, I'm doing the best I can. It's just only been two and a half weeks since my surgery. I'm not even supposed to be touching a hand piece. The doctor gave me a release on December 30 for light duty. And I can only do so much." Id. On January 17 or 18, 2005, Mr. Kelly called plaintiff into his office to inform plaintiff that he was concerned about his production. Mr. Kelly again told plaintiff that he had a hard time justifying his salary, given his lower production. Dkt. # 21, Ex. 11, at 15. Mr. Kelly informed plaintiff that he would have to increase his production to its previous level. Plaintiff returned to his work area and began grinding teeth. By the end of the day, plaintiff's right wrist was in pain. Id. at 17. He continued to grind teeth to increase production through that week. Id.

On Friday, January 21, 2005, plaintiff was upset and went to Mrs. Kelly's office to voice his frustrations. There is a dispute about the events that caused him to be upset. Mrs. Kelly claims that plaintiff was upset because he could not take any personal phone calls that day. Dkt. # 21, Ex. 10, Part 2, at 2-3. Plaintiff contends that he upset because Mr. Kelly was "pushing, pushing, pushing" him that day. Dkt. # 19, Ex. 1, at 41. While plaintiff was in Mrs. Kelly's office, Joe Cole ("Cole"),

5

another employee, entered her office and joined the conversation. According to plaintiff, he informed Mrs. Kelly and Cole that Mr. Kelly's "pushing" "[m]akes me want to look on the Internet. Makes me want to see what else is out there." Dkt. # 19, Ex. 1, at 41. Plaintiff recounts that Mrs. Kelly and Cole tried to persuade him that he should not leave Kelly & Associates and that he responded "I don't want to leave." Id. In describing the conversation of January 21, Mrs. Kelly claims that plaintiff threw a "tantrum." Dkt. # 19, Ex. 10, Mrs. Kelly Deposition, at 6. Mrs. Kelly and Cole state that they told him to "cool off." Dkt. # 19, Ex. 7, Cole Affidavit, ¶ 4. Cole states that, during this meeting, plaintiff informed him and Mrs. Kelly that "he was well respected in the dental laboratory industry and that he did not have to be treated this way." Id., ¶ 5.

At some point on January 21, 2005, plaintiff spoke with some employees in the model and dye section of the laboratory.[1] One of the employees recounts that plaintiff told them that he and his wife were preparing his resume and that he was "outta here." Dkt. # 19, Ex. 8, Mrs. Kelly Affidavit, ¶ 5. While plaintiff admits that he made references to his resume, he contends that he did not tell them that he was looking for another job or planning to leave Kelly & Associates. Dkt. # 21, Ex. 11, at 23. He claims that he had no intention of quitting that day. Id. at 24.

On Sunday, January 23, 2005, Mr. Kelly called plaintiff and told him that plaintiff did not have to come into work on Monday and that he could collect his belongings. Dkt. # 21, Ex. 11, at 24. Plaintiff did not try to persuade Mr. Kelly to retain him, nor did he mention that he had previously quit. Id.

---

[1] It is disputed whether these conversations took place before or after the meeting with Mrs. Kelly.

In February 2005, Dr. Watts placed plaintiff on "full release" such that he was no longer restricted to "light duty" work. At the time of one of his depositions, in May 2006, plaintiff contends that his hand was functioning at ninety-five percent. Dkt. # 21, Ex. 11, at 41. After his full release, plaintiff was "free to get up and go out and see what kind of work I could find." Dkt. # 21, Ex. 11, at 28. He looked for several jobs in the dental profession, but was unable to find other employment with another dental laboratory. Id. Eventually, he and his wife decided to start their own business doing dental work. Id. at 29.

On February 4, 2005, Mrs. Kelly sent a letter to the Oklahoma Employment Security Commission stating: "Jamie [sic] Delgado ("Employee") was recently terminated by our company . . . . [A] meeting was held with specific department managers and a unanimous decision was made to terminate Employee." Dkt. # 21, Ex. 1. In her deposition, Mrs. Kelly testified:

> Q: And it [the February 4, 2005 letter] says a decision was made to terminate employee?
> A: Terminate means end. Terminate doesn't mean –
> Q: I agree.
> A: Terminate doesn't mean quit. It can be either way. We decided we did not want him back. He is terminated. That's it, goodbye.

Dkt. # 21, Ex. 10, Mrs. Kelly Deposition, at 10.

Plaintiff filed a claim in the Workers' Compensation Court in Oklahoma City, Oklahoma on February 17, 2005. Dkt. # 19, Ex. 10. He filed charges against Kelly & Associates with the Equal Employment Opportunity Commission ("EEOC") on February 28, 2005. On the EEOC form, he indicated that he "did not need any special accommodations. I only needed a few weeks of light duty." Dkt. # 19, Ex. 1, at 40. The EEOC dismissed plaintiff's claim. On August 31, 2005, Mrs. Kelly sent a letter to the Oklahoma Human Rights Commission stating: "Delgado was not fired or discharged! He voluntarily quit his employment with our company." Dkt. # 21, Ex. 2.

## II.

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 317.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52.

### III.

In his first claim for relief, plaintiff argues that defendant wrongfully discharged him in violation of OKLA. STAT. tit. 85, § 5. In his second claim for relief, plaintiff argues that he was a "qualified individual with a disability," as defined by the ADA. Plaintiff alleges that defendant regarded plaintiff as having a substantially limiting impairment and that defendant failed to provide reasonable accommodation to plaintiff. Part A, below, addresses plaintiff's wrongful discharge claim. Part B, below, addresses plaintiff's ADA claim.

### A.

As an initial matter, the Court notes that plaintiff was an at-will employee of Kelly & Associates. Under Oklahoma law, an at-will employee ordinarily may be terminated by the employer at any time, without liability. Hinson v. Cameron, 742 P.2d 549, 552 n.6 (Okla. 1987). However, an exception to this general rule is that an employer may not discharge an employee for exercising his rights under the Oklahoma Workers' Compensation Act, which provides, in pertinent part:

> No person, firm, partnership or corporation may discharge any employee because the employee has in good faith filed a claim, or has retained a lawyer to represent him in said claim, instituted or caused to be instituted, in good faith, any proceeding under the provisions of Title 85 of the Oklahoma Statutes, or has testified or is about to testify in any such proceeding. Provided no employer shall be required to rehire or retain any employee who is determined physically unable to perform his assigned duties.

OKLA. STAT. tit. 85, § 5.

In Buckner v. General Motors Corp., 760 P.2d 803 (Okla. 1988), the Oklahoma Supreme Court set forth the burdens of proof in a retaliatory discharge case, which correspond to the

jurisprudence developed in federal employment discrimination cases.[2] To make a prima facie case of retaliatory discharge, plaintiff must show (1) employment, (2) on the job injury, (3) receipt of treatment under circumstances which put defendant on notice that treatment had been rendered for a work-related injury, or that plaintiff in good faith instituted, or caused to be instituted, proceedings under the Oklahoma Workers' Compensation Act, and (4) consequent termination of employment. Id. at 806. If plaintiff makes a prima facie case, the burden shifts to defendant to "rebut the inference that its motives were retaliatory by articulating that the discharge was for a legitimate non-retaliatory reason." Id. At this point, defendant has the burden of persuasion, not the burden of production. If defendant carries its burden of persuasion, then the "factual inquiry proceeds to a new level of specificity." Id. at 807. Plaintiff must then demonstrate that the "reason offered by the employer for terminating the employee was not the true reason for the employment decision but was, rather, a pretext." Id. Whether plaintiff has made a prima facie case, whether defendant has rebutted the plaintiff's case with evidence of a legitimate non-retaliatory reason for discharge, and whether defendant's rebuttal has created a genuine issue of material fact are questions for the Court to decide. Rogers v. Welltech, Inc., 813 P.2d 534, 536 (Okla. Ct. App. 1991).

"The most basic element in making out a prima facie case for retaliatory discharge in Oklahoma is that there must be a discharge from employment." Large v. Acme Engineering and Mfg. Corp., 790 P.2d 1086, 1988 (Okla. 1990). In other words, the employee must have been terminated from his employment. Here, there is clearly a dispute whether plaintiff was terminated on January 23, 2005 or whether he quit on January 21, 2005. Plaintiff contends that this

---

[2]  However, the Oklahoma Supreme Court noted, "we do not mean to signal the wholesale adoption and application of the federal law of employment discrimination to retaliatory discharge claims brought under § 5." Buckner, 760 P.2d at 806.

10

"fundamental factual dispute . . . transcends all legal issues and compels the denial of summary judgment." Dkt. # 21, at 5. However, in its motion for summary judgment, defendant assumes <u>arguendo</u> that plaintiff was terminated from his job. Dkt. # 19, at 2. As defendant correctly notes in its reply brief, the factual dispute of whether plaintiff was terminated or quit does not preclude the granting of summary judgment. On the contrary, given this dispute, the Court will assume, viewing the facts in the light most favorable to plaintiff, that plaintiff was terminated from Kelly & Associates. The Court must determiner whether, after giving plaintiff the benefit of the doubt on this disputed fact, plaintiff can still make out a prima facie case of retaliatory discharge.

In its brief in support for its motion for summary judgment, defendant states: "**For summary judgment purposes only**, [Kelly & Associates] does not dispute that Plaintiff can satisfy the first two elements of a *prima facie* case: employment and an on-the-job injury." Dkt. # 19, at 13 (emphasis in original). Thus, the Court need not address the first two elements of the prima facie case; it need address only the third and fourth elements of the prima facie case.

With respect to the third element of the prima facie case for retaliatory discharge, it is undisputed that plaintiff did not file a workers' compensation claim until February 17, 2005, after his employment ended with Kelly & Associates. Thus, it is clear that plaintiff was not terminated in retaliation for the filing of a claim itself. However, in <u>Buckner</u>, the court noted that "proceedings may be instituted without actually filing a claim." 760 P.2d at 808. According to the Oklahoma Supreme Court, "the Legislature must have intended the institution of proceedings language in § 5 to protect the employee during the period of vulnerability which may exist from the time the employer becomes aware of the injury to the time a claim is filed." <u>Id.</u> at 811. Thus, the fact that plaintiff did not file a claim until after his alleged termination does not automatically mean that

plaintiff cannot make out a prima facie case of retaliatory discharge; on the contrary, if plaintiff can show that he instituted proceedings, then he can satisfy the third element of the prima facie case.

In <u>Buckner</u>, the court held that the receipt of medical treatment by the employee at the job site by a physician provided by the employer constituted the institution of proceedings for purposes of making a prima facie case. <u>Id.</u> at 810. In so ruling, the court stated:

> Merely seeking and receiving first aid is not in and of itself sufficient to institute proceedings. Some other evidence sufficient to persuade the trier of fact that the worker intended or reasonably could have intended to institute proceedings is necessary. . . . First aid coupled with circumstances which raise a clear inference of an anticipated claim must be present before the institution of proceedings is triggered. For now, we simply conclude that the provision of medical treatment by the employer, when accompanied by circumstances (including, e.g., sending the employee home to recuperate from an on-the-job-injury) which would lead a reasonable employer to infer that a workers compensation claim would in all probability ensue, constitutes the institution of proceedings.

<u>Id.</u> at 811. In <u>Baber v. Payless Cahsways, Inc.</u>, 787 P.2d 1301, 1301-03 (Okla. Ct. App. 1990), the court applied the <u>Buckner</u> standard and held that plaintiff failed to satisfy the third prong of the prima facie case of retaliatory discharge where the employee did not ask the employer to provide medical treatment, testified that he did not think about filing a claim until after his termination, and did not mention the possibility of filing a claim to anyone associated with the employer. The court concluded that, at the time of his termination, circumstances did not exist which would lead a reasonable employer to infer that a compensation claim would likely ensue.

Here, the Court finds that plaintiff has not met his burden in satisfying the third prong of the prima facie case. As in <u>Baber</u>, plaintiff did not ask defendant to provide medical treatment; rather, he simply used the insurance that was provided to him through Kelly & Associates. Most importantly, plaintiff did not give defendant any indication prior to his termination that he would, in fact, file a workers' compensation claim. While there is evidence that defendant knew of

plaintiff's injury and that resulting surgery, plaintiff gave no indication that he would miss work as a result of that injury.  On the contrary, plaintiff took his vacation time to recover from the surgery and affirmatively chose to return to work only a week after surgery. Whether Mrs. Kelly urged plaintiff to return to work or whether plaintiff asked to return to work is irrelevant; the fact remains that plaintiff did not miss any work.  Thus, far from setting forth circumstances that would "lead a reasonable employer to infer that a workers compensation claim would in all probability ensue," Buckner, 760 P.2d at 811, plaintiff acted in a manner that suggested that he would not file a workers' compensation claim.  The fact that plaintiff contends, and defendant disputes, that plaintiff told defendant prior to his surgery that he could file a workers' compensation claim does not change the Court's analysis.  There is no evidence that, after plaintiff returned to work following his surgery, plaintiff mentioned filing a workers' compensation claim to either Mr. Kelly or to the other employees at Kelly & Associates.  Plaintiff's statements to Mr. Kelly that he was working as hard as possible given the recent surgery still did not put defendant on notice that plaintiff planned to file a workers' compensation claim.  Thus, plaintiff has not satisfied the third part of the prima facie case for retaliatory discharge.

Further, even assuming that plaintiff satisfied the third prong of the prima facie case, the Court determines that plaintiff has failed to make out the fourth prong of the prima facie case – consequent termination.  Whether there is evidence of consequent termination "is dependent upon the employee producing evidence as would give rise to a legal inference the discharge was significantly motivated by retaliation for the employee exercising statutory rights."  Wallace v. Halliburton Co., 850 P.2d 1056, 1059 (Okla. 1993).  Although plaintiff need not meet a "but for" standard, he "must present evidence that does more than show the exercise of [his] statutory rights

'was only one of many possible factors resulting in [his] discharge.'" Blackwell v. Shelter Mutual Ins. Co., 109 F.3d 1550, 1554 (10th Cir. 1997) (quoting Wallace, 850 P.2d at 1059) (applying Oklahoma law on retaliatory discharge). Here, plaintiff has not set forth evidence that defendant was motivated to discharge him on the basis of his institution of workers' compensation proceedings. On the contrary, the evidence clearly shows that defendant was primarily motivated by plaintiff's low production levels. While Mr. Kelly may have been harsh in his demands for increased production given plaintiff's recent surgery, his conduct does not suggest that he was motivated to terminate plaintiff based on any likelihood that plaintiff would file a workers' compensation claim or otherwise exercise his statutory rights.

Plaintiff appears to rely heavily on the temporal proximity between his surgery and termination to prove retaliation. While timing "may be evidence of a retaliatory discharge," "timing does not by itself give rise to the level of evidence required to establish a prima facie case." Wallace, 850 P.2d at 1059. "To hold otherwise would be to require any employer laying off a worker who has at any time in the past filed a Workers' Compensation action to submit to a jury trial based purely on the coincidence of the layoff and the past filing." Thompson v. Medley Material Handling, Inc., 732 P.2d 461, 464 (Okla. 1987). In Thompson, the court found that the employee failed to connect his termination to the filing of a workers' compensation claim because there was only evidence of temporal proximity between the two events. Id. In Taylor v. Cache Creek Nursing Ctrs., 891 P.2d 607, 610 (Okla. Ct. App. 1995), the court held that the fact that plaintiff was fired immediately after returning from a two-week, doctor-ordered disability leave was not sufficient to raise a legal inference that the termination was significantly motivated by retaliation. The court noted that "there is no evidence, for example, showing a pattern of termination of workers who filed

14

claims, or of pressure put on workers not to file claims." Id. Similarly, here, there is no evidence that Kelly & Associates discouraged the filing of workers' compensation claims or otherwise discouraged the receipt of medical treatment for job-related injuries. In this case, Mr. Kelly in no way tried to persuade plaintiff to avoid medical treatment; rather he permitted plaintiff to go to his doctors' appointments on his lunch break and worked with plaintiff to determine the best date for surgery. Ultimately, viewing the evidence in the light most favorable to plaintiff, the Court cannot conclude that the evidence is sufficient to support a legal inference that plaintiff's termination was significantly motivated by retaliation for plaintiff's exercising his statutory rights. Therefore, the Court finds that defendant is entitled to summary judgment on plaintiff's retaliatory discharge claim.

Since the Court finds that plaintiff has failed to make a prima facie case for retaliatory discharge, the Court need not address defendant's argument that it terminated plaintiff's employment for legitimate, non-discriminatory reasons – i.e., due to his violation of the company cellular phone policy and due to plaintiff's behavior on January 21, 2005.

**B.**

In his second claim for relief, plaintiff alleges that defendant violated the ADA in failing to accommodate his disability. The ADA provides, in pertinent part, that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . discharge of employee, . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "disability" is defined as: (a) a physical or mental impairment that substantially limits one or more

of the major life activities of such individual; (b) a record of such an impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(2); see also Sutton v. United Air Lines, Inc., 5276 U.S. 471, 478 (1999). The regulations promulgated by the EEOC define "substantially limits" to mean:

> (i) unable to perform a major life activity that the average person in the general population can perform; or
> (ii) significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j).

To establish a prima facie case of discrimination under the ADA, plaintiff must show: (1) that he is disabled within the meaning of the ADA; (2) that he is qualified – with or without reasonable accommodation; and (3) that he was discriminated against because of his disability. McKenzie v. Dovala, 242 F.3d 976, 969 (10th Cir. 2001); Aldrich v. Boeing Co., 146 F.3d 1265, 1269 (10th Cir. 1998). Here, the primary issue is whether plaintiff has established that he is disabled within the meaning of the ADA.

It is quite clear that plaintiff does not fall under the definition of disability in 42 U.S.C. § 12102(2)(a). The ADA does not cover temporary impairments. See Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198 (2002) (holding that, to constitute an impairment that substantially limits a major life activity, "[t]he impairment's impact must . . . be permanent or long term"); Borgialli v. Thunder Basin Coal Co., 235 F.3d 1284, 1290 (10th Cir. 2000) (holding that the ADA "was not designed to apply to temporary conditions"); 29 C.F.R. § 1630.2(j) (noting that the "permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment" should be considered in determining whether an individual is substantially limited

16

in a major life activity). Here, plaintiff admits that his surgery limited his ability to perform manual tasks for only six weeks following surgery. He admits that, after his doctor granted him full release to return to work, he could perform all of his work functions. Thus, plaintiff's "disability" resulting from carpal tunnel syndrome and the ensuing surgery was only temporary.[3]

Further, plaintiff is not disabled under 42 U.S.C. § 12102(2)(a) because he was not substantially limited in the major life activity of performing manual tasks. Performing manual tasks is considered a major life activity under the ADA. See 45 C.F.R. § 84.3(j)(2)(ii). However, in Toyota Motor Mfg., the Supreme Court held that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." 534 U.S. at 198; see also Holt v. Grand Lake Mental Health Ctr., 443 F.3d 762, 766 (10th Cir. 2006). Here, plaintiff has set forth no evidence that he was prevented from engaging in manual tasks that are central to daily life. He simply notes that he was unable to operate the grinding machine – an activity that is not central to daily life.

Plaintiff contends, however, that defendant regarded him as having a disability that substantially impaired him from performing manual tasks. Dkt. # 2-2, Petition, ¶ 18. There are two ways that plaintiff can fall under the "regarded as" statutory definition: (1) defendant mistakenly believed that plaintiff had a physical impairment that substantially limited one or more major life activities; or (2) defendant mistakenly believed that an actual, nonlimiting impairment substantially

---

[3]  The Court notes that some persons who suffer from carpal tunnel syndrome may be covered by the ADA. The Supreme Court has noted that some impairments, such as carpal tunnel syndrome, require an "individualized assessment" because the "symptoms vary widely from person to person." Toyota Motor Mfg., 534 U.S. at 199. The Court merely notes that, here, plaintiff's impairment was temporary.

17

limited one or more major life activities. Sutton, 527 U.S. at 2149-50. "In both cases, it is necessary that a covered entity [i.e., defendant] entertain misperceptions about the individual – it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting." Id. To survive summary judgment, plaintiff must raise a genuine issue of material fact that defendant (1) mistakenly perceived him as being impaired, and (2) mistakenly believed the perceived impairment substantially limited at least one major life activity. Lanman v. Johnson County, Kansas, 393 F.3d 1151, 1156-57 (10th Cir. 2004).

There is no evidence that defendant regarded plaintiff as being impaired or substantially limited in the major life activity of performing manual tasks. There is no evidence that Mr. Kelly or other employees at Kelly & Associates viewed plaintiff's injury as anything other than temporary. Indeed, by plaintiff's account of the facts, Mrs. Kelly asked plaintiff to return to work only a week after surgery. Moreover, neither Mr. Kelly nor Mrs. Kelly perceived plaintiff to be substantially limited in performing manual tasks. On the contrary, they put pressure on plaintiff – against his desire – to use the grinding machine to increase production. Thus, far from treating plaintiff as one who could not perform the manual tasks required by the job, Mr. Kelly expected plaintiff to perform at the same level that he had been performing before his surgery. While plaintiff objected to defendant's treatment of plaintiff and failure to "ease" him back into work, it is precisely that treatment that shows that defendant did not regard plaintiff has having an impairment that substantially limited a major life activity. Therefore, defendant is entitled to summary judgment on plaintiff's ADA claim.

## IV.

In summary, the Court grants summary judgment as to plaintiff's retaliatory discharge and ADA claims. The Court finds that plaintiff has failed to establish the third and fourth prongs of the prima facie case for retaliatory discharge. Further, plaintiff has not made a prima facie case under the ADA. Plaintiff is not actually disabled under the ADA, and plaintiff has failed to raise a genuine issue of material fact that defendant regarded plaintiff as having an impairment that substantially limited a major life activity.

**IT IS THEREFORE ORDERED** that Motion for Summary Judgment (Dkt. # 18) filed by defendant Tom Kelly & Associates, Inc. is hereby **granted**. Defendant's Motion in Limine (Dkt. # 22) is **moot**. A separate judgment is entered herewith.

**DATED** this 20th day of December, 2006.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT